```
         FILED ___ ___ LODGED
         ___ RECEIVED

            OCT 11 2013

         CLERK U.S. DISTRICT COURT
     WESTERN DISTRICT OF WASHINGTON AT TACOMA
     BY                              DEPUTY
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. MJ13-5216 |
| Plaintiff, | |
| v. | COMPLAINT for VIOLATION<br>Title 18, United States Code,<br>Sections 1163 and 2 |
| RENEE PEARL PELETI, | |
| Defendant. | |

BEFORE the Honorable Karen L. Strombom, United States Magistrate Judge, Tacoma, Washington,

The undersigned complainant being duly sworn states:

**COUNT 1**
**(Embezzlement from Indian Tribal Organization)**

Beginning at a time unknown, but believed to be not later than in or about July 2008, and continuing through in or about April 2013, at Suquamish, Washington, within the Western District of Washington, RENEE PEARL PELETI, being an agent and employee of the Suquamish Indian Tribe's Indian Child Welfare Department, did embezzle, steal, knowingly convert to her use or the use of another, willfully misapply and willfully permit to be misapplied, moneys, funds and credits belonging to an Indian tribal organization, to wit:

1   approximately $115,308.49 in proceeds of checks and vouchers issued by the Suquamish
2   Tribe's Indian Child Welfare Department, which proceeds belonged to the Suquamish Tribe.
3         All in violation of Title 18, United State Code, Sections 1163 and 2.
4         The undersigned complainant being duly sworn further states:
5         1.   I am a Special Agent with the Federal Bureau of Investigation (FBI), and have
6   been so employed for eleven years. I am currently assigned to the Poulsbo Resident Agency
7   of the Seattle Division. The FBI is responsible for enforcing the federal criminal statutes of
8   the United States. While employed as an FBI Agent, I have investigated and/or participated
9   in investigations of a wide array of federal criminal violations, including the Embezzlement
10  and Theft from Indian Tribal Organizations.
11        2.   The information contained in this affidavit is based upon my own
12  investigation, as well as upon court documents, police reports, the investigations conducted
13  by others, and the details related to me by others familiar with this matter. Because this
14  affidavit is made for the limited purpose of establishing probable cause, I have not listed
15  each and every fact known to me concerning this investigation.
16        3.   In early April, 2013, an employee of the Suquamish Tribe's Indian Child
17  Welfare (ICW) Department picked up a series of ICW checks from the Finance Department
18  and noted that the amounts of several of the checks were higher than normal. The employee
19  alerted her supervisor, which led to an internal investigation.
20        4.   On April 9, 2013, the Tribe's Finance Department alerted the Suquamish
21  Police Department (SPD) that they had examined their electronic purchase authorization
22  system, known as Microix, and readily discovered seven instances where check requests had
23  been fraudulently altered, resulting in the issuance of checks in amounts that were
24  substantially greater than the original requested amounts. The Finance Department also
25  reported an ICW administrative assistant, RENEE PELETI, cashed these checks. Further
26  examination of the Microix system revealed that PELETI submitted requests for funds for
27  ICW clients to the director for approval. Once approved, PELETI increased the amount of
28  the of the check requests before submitting them to the Finance Department. Once the

checks were printed and returned to ICW, it appeared that PELETI then fraudulently signed the name of the original payees on the back of the checks and wrote "Pay to the Order" of herself, cashed the checks and converted the check proceeds.

5. Based on the above evidence, on April 9, 2013, SPD arrested PELETI on tribal charges. Following her arrest, SPD interviewed PELETI and informed her that the interview was being video recorded. PELETI was read her Miranda warnings from a department issued card and waived her rights. During the interview, PELETI was shown copies of the seven checks noted above. PELETI admitted that she increased the check amounts, forged the endorsements on the checks and deposited the check proceeds into her account at Bank of America. PELETI further admitted that she started taking Tribal money approximately one year earlier.

6. Bank of America (BOA) records were obtained as part of the investigation and revealed the following: six of above-referenced checks were endorsed in the name of RENEE PEARL PELETI and deposited into BOA account number XXXX8606 between February 11, 2013 and March 22, 2013; another check was endorsed in the name of RENEE PEARL PELETI and deposited into BOA account number XXXXXX8538; BOA account no. XXXX8606 is a business account in the name of TK Construction/Happy Peleti, jointly owned by PELETI and her husband, Happy; PELETI deposited all seven checks via ATM at the BOA branch in Bainbridge Island, WA. In addition, BOA video recordings showing PELETI at a Bainbridge Island ATM machine, making deposits on February 11, 2013, March 11, 2013, March 12, 2013, and on March 22, 2013. In the videos on February 11, 2013 and March 12, 2013, PELETI can be seen wearing a coat bearing the Suquamish Tribe logo on the back. Furthermore, an image of a check bearing the Suquamish Tribe logo can be seen being deposited into the ATM in the March 22, 2013 video.

7. Interviews were conducted with ICW employees and Tribal employees familiar with the Microix accounting software in order to determine PELETI's access to the system, her position in ICW in reference to using the system, and her ability to change vendors and amounts on checks. From these interviews, law enforcement learned that the

Tribe's departments, including ICW, employ a three-step process for the issuance and approval of checks:

    a. A "requestor" inputs the request into the Microix system (in ICW, PELETI and two other employees had requestor status, with PELETI being the primary requestor);

    b. A department director approves the check request; and

    c. A Deputy Procurement Officer (DPO) provides final departmental approval before the request is submitted to the Finance Department, which is responsible for issuing checks for all departments in the Tribe. PELETI was the DPO for ICW (PELETI could manipulate the amount of the check request without oversight because of a lack of internal controls, i.e., the functions of a check requestor and DPO should not have been performed by the same person).

8. Furthermore, PELETI was the person primarily responsible for picking up checks from the Finance Department and for distributing the checks to ICW clients in person at the ICW office or by mail.

9. Microix records indicate the as the DPO, PELETI made changes to the vendor name and/or amount on numerous checks, which she later appeared to have fraudulently endorsed to herself.

10. On April 23, 2013, a SPD detective searched the two-drawer filing cabinet in PELETI's workspace, which had been secured at the time of PELETTI's arrest two weeks earlier. The following items were located during this search which related to checks from Tribal Funds:

    a. A copy of Tribal Funds check stub number 1200103 with handwritten signatures on it, which appear to reflect an individual practicing that signature. Further review of the Tribe's canceled checks shows that check number 1200103 appears to one where PELETI forged the signature of the original payee and then endorsed the check as payable to herself.

    b. Copies of Tribal Funds check stub numbers 26926, 29390, 1203531, 1204720 and 1204730. Upon review of the Tribe's corresponding

   cancelled checks, it appears that PELETI forged the signature of the original payee on each of these checks and then endorsed them as payable to herself.

  c. A printout from the Microix accounting system listing forty-four purchase orders generated for ICW on June 27, 2012. Highlighted on the printout were six purchase orders that correspond with Tribal Fund checks where PELETI appears to have forged the signatures of the original payee and then endorsed the checks as payable to herself.

 11. Interviews were conducted with nine individuals whose names were listed as the original payee on approximately 131 Tribal Funds checks, which appeared to have been forged in the manner described above. These individuals reviewed the front and back copies of canceled checks where they were listed as the payees. Some of these checks had endorsements on the back which contained only the payees' signatures. Others contained endorsements on the back with the payees' signatures followed by "Pay to the Order of Renee PELETI" and PELETI's signature. In almost every instance where the endorsement contained only the payees' signatures, the interviewees recalled receiving the checks, recognized their signatures, and/or recalled cashing or depositing the check proceeds into their bank accounts. In every instance where the endorsement on the back copy of the check contained their name as well as "Pay to the Order of Renee PELETI", followed by Renee PELETI's signature, the interviewees denied that the signatures were theirs, and denied ever signing a check over to PELETI. One interviewee stated that the signature on the back of 13 separate checks bearing her name as payee was not her handwriting, and noted that her name was even misspelled. Furthermore, several of the interviewees stated that they did not even know PELETI.

 12. As part of the investigation, an extensive review of the Tribe's Microix accounting system, and front and back copies of canceled Tribal Funds checks provided by Wells Fargo and Union Bank (the Tribe had checking accounts with both banks during the period in question) was undertaken in order to determine the scope of PELETI's fraudulent activity. That review revealed that between July 2, 2008 and March 28, 2013, there were

COMPLAINT/PELETI - 5

approximately 261 checks totaling approximately $88,747.05, where PELETI appeared to forge the signatures of the original payees and then endorse the checks as payable to herself.

13. A review of BOA records (PELETI banked at BOA) revealed that 215 of the 261 Tribal checks noted above were deposited into PELETI's personal bank account between July 21, 2008 and April 30, 2013.

14. During the April 23, 2013 search of the filing cabinet in PELETI's workspace, other items of interest were discovered, which helped to identify further the methods PELETI used to defraud the Tribe. One of those items is a copy of Tribal Funds check number 22780, dated March 28, 2012, in the amount of $207.44, payable to Puget Sound Energy (PSE). Photocopied on the same page, is a payment stub from PSE for account number XXX-XXX-000-0, bearing the name Renee P. PELETI and an address associated with PELETI on Bainbridge Island, with an amount owed of $291.01, and a due date of April 30, 2012. As is discussed below in paragraph 17, PELETI used numerous Tribal Funds checks, including check number 22780 to pay her personal PSE bill bearing account # XXX-XXX-000-0. According to Tribal employees in ICW and Finance, PELETI was not an ICW client, did not have dependents who were ICW clients and was not authorized to use ICW or Tribal funds to pay her PSE bill.

15. Also discovered during the April 23, 2013 search were four receipts for PSE payments made by check through Kitsap Bank, 10140 High School Road, Bainbridge Island, WA, to PSE account numbers XXX-XXX-000-0 and XXX-XXX-923-7. A review of PSE's website revealed that customers may pay their bill, with cash or check only, at more than 150 payment processing locations in the state of Washington, including the Kitsap Bank branch identified in this paragraph.

16. After reviewing the above documents, I requested Tribal employees examine the Tribe's banking records and provide all canceled checks to PSE that contain an endorsement to PSE account # XXX-XXX-000-0. Tribal employees provided front and back copies of fourteen checks that matched the criteria above. Supporting documentation entered into the Microix system to request those checks revealed purchase orders for ICW clients

with PSE account numbers different than the account number associated with PELETI above.

17. Based on a review of the fourteen checks and records provided by Kitsap Bank and PSE, I determined that PELETI caused $2,893.62 in fraudulent payments to be made to her personal account at PSE, account no. XXX-XXX-000-0, by means of the following Tribal Funds checks:

| DATE | CHECK NUMBER | CHECK AMOUNT DEPOSITED |
| --- | --- | --- |
| 9/3/2010 | 3491 | $234.58 |
| 12/3/2010 | 7715* | $159.00 |
| 2/18/2011 | 9147 | $230.80 |
| 4/18/2011 | 11723* | $135.36 |
| 6/4/2011 | 13021* | $157.59 |
| 2/9/2012 | 19705 | $235.20 |
| 3/16/2012 | 22179* | $259.70 |
| 4/27/2012 | 22780 | $207.44 |
| 6/5/2012 | 24794 | $220.77 |
| 8/28/2012 | 28013 | $110.18 |
| 10/24/2012 | 29977* | $305.23 |
| 12/20/2012 | 1201479 | $286.14 |
| 3/21/2013 | 1204748 | $191.66 |
| 3/21/2013 | 1204944 | $159.97 |
| TOTAL | | $2,893.62 |

For each of the five Tribal Funds checks listed above that is followed by an asterisk, the amount of the check exceeded the amount paid or credited to PELETI's personal PSE account. The check proceeds were credited partially to PELETI's and another PSE account.

18.     The ICW Department provides funds to assist with a variety of different essential items for Tribal children in need such as food, clothing and school supplies. Food assistance is typically provided in the form of a monthly check or food voucher. The amount of assistance received is based on need and on the number of children in the house who are ICW clients. If a client lived in the local area, they typically received a food voucher for Albertsons which could only be used at the Albertsons in Kingston or Poulsbo, WA. If a client lived outside the local area, they typically received a check. A client who received a food voucher would shop for groceries at one of the two Albertsons described above, present the voucher to the cashier to pay for their groceries, sign the voucher, and pay for any overages with their own money (usually cash, debit or credit card). Subsequently, Albertsons would provide the Tribe with a copy of the signed voucher along with the receipt for items purchased.

19.     In reviewing ICW voucher records as part of this investigation, signature discrepancies were noted on numerous returned Albertsons food vouchers. An example of a signature discrepancy might be incorrect initials, initials signed when the client would normally sign with a full name, and/or different signatures/initials signed on separate voucher returns bearing the same client identification number. It was noted that on the returned vouchers where signature discrepancies were found, the corresponding receipts all contained Albertsons preferred customer card number XXXXXXX6684.

20.     A review of records provided by Albertsons revealed that preferred customer card number XXXXXXX6684 is associated with an account in the name RENEE PELETI.

21.     Tribal employees were asked to provide the entire Albertsons voucher receipts bearing customer card number XXXXXXX6684. A review of those receipts revealed approximately 126 Albertsons food vouchers where preferred customer card number XXXXXXX6684 was used in conjunction with the purchase of approximately $23,667.82 in groceries between April 10, 2010 and April 4, 2013. The corresponding purchase order

requests for ICW funds that match each of those receipts show that when the requests were approved by the director, they appeared to be intended for legitimate ICW clients.

22. Interviews were conducted with nine individuals who served as the guardians of children whose ICW client identification numbers were listed as the designated recipient on approximately 35 of the requests for Albertsons food vouchers that were located as part of the 126 vouchers noted above. Five of these individuals live outside of the local area and reported that they never received Albertsons food vouchers as part of their ICW benefits. Nevertheless, all nine individuals were shown copies of ICW Albertsons food vouchers bearing their dependents' client identification number with corresponding receipts, and asked to review them to see if they contained their signature and preferred customer card number. Of the 35 vouchers reviewed, none of the nine individuals recognized their signature on any of the vouchers. In addition, while most individuals did not know their preferred customer card number, all acknowledged that if/when they shopped at Albertsons; they would use their phone number to receive a preferred customer discount on grocery purchases. In other words, if the purchase had been made by or on behalf of an ICW client family, the receipts should have reflected their preferred customer card number, and not PELETI's card number XXXXXXX6684. All nine individuals denied ever asking PELETI to shop for them at Albertsons, with several noting they did not even know PELETI.

23. In addition to the above evidence, of the 126 Albertsons food voucher receipts bearing PELETI's preferred customer card number, 51 receipts were for purchases that exceeded the amount of the voucher and resulted in the customer paying the difference with a debit card. BOA records revealed that the debit card used to pay the overages was associated with PELETI's BOA account number XXXX8606.

24. Interviews were conducted with Tribal employees in Finance and ICW. Those employees noted that although PELETI worked for ICW, she was not a client of ICW, did not have dependents who were clients of ICW, and was not entitled to receive Albertsons

food voucher benefits from the ICW program, especially under the guise of legitimate clients.

25. The Suquamish Tribe ICW Department is a wholly owned and operated service component of the Suquamish Tribe, a federally recognized Indian tribe.

26. Based on the foregoing, I submit that probable cause exits to believe that RENEE PEARL PELETI did embezzle, steal, knowingly convert to her use or the use of another, willfully misapply and willfully permitted to be misapplied, moneys, funds and credits belonging to an Indian tribal organization, namely the Suquamish Tribe ICW Department, in violation of Title 18, United States Code, Sections 1163 and 2.

*Colleen B. Sanders*
COLLEEN B. SANDERS, Complainant
Special Agent, FBI

Based on the Complaint and Affidavit sworn to before me, and subscribed in my presence, the Court hereby finds that there is probable cause to believe the defendant committed the offense set forth in the Complaint.

DATED this 11th day of October, 2013.

*Karen L. Strombom*
KAREN L. STROMBOM
United States Magistrate Judge